**I.P. LUND TRADING ApS and Kroin Incorporated, Plaintiffs,**

v.

**KOHLER COMPANY and Robern, Inc., Defendants.**

CIV. A. No. 97–10427–NG.

United States District Court, D. Massachusetts.

April 2, 1998.

Cornelius J. Moynihan, Jr., Steven N. Fuller, David H. Gibbs, Peabody & Brown, Boston, MA, for Kroni Inc.

Cornelius J. Moynihan, Jr., Steven N. Fuller, David H. Gibbs, Allison E. Picott, Jason Kravitz, Peabody & Brown, Boston, MA, for I.P. Lund Trading.

Hugh Latimer, Wiley, Rein & Fielding, Washington, DC, Stephen H. Lash, Jager, Smith, Stetler & Arata, Boston, MA, for Kohler Co., Robern, Inc.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

In this case, plaintiffs I.P. Lund Trading ApS ("Lund") and Kroin Incorporated ("Kroin") seek to enjoin defendants Kohler Company ("Kohler") and Robern, Inc. ("Robern") from making and distributing the "Falling Water" faucet, a rival of plaintiffs "VOLA" faucet. [For a fuller statement of the facts, *see Memorandum and Order*, February 5, 1998, at 4–7 (No. 97–10427–NG.)]

On February 5, 1998, I issued an Order granting a preliminary injunction in favor of the plaintiffs. I found that plaintiffs had met their burden of proving the likelihood of success on their claim that the defendants diluted the trade dress protection extended to the VOLA faucet under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125. I did not, however, find that the plaintiff had demonstrated trade dress infringement. The relevant consumers would not be confused as to the source of the faucet, as required in an infringement proceeding; indeed, they could deliberately purchase a Falling Water faucet, knowing what it is, precisely because it looks like the VOLA or for any number of reasons—price, availability, etc. Absent dilution protection under the FTDA, the plaintiffs' design would help to sell the defendants' product and, as a result, the once unique VOLA's selling power would be diminished.

My Order reserved for further briefing defendants' constitutional challenge to the application of the FTDA to the facts of this case.

On February 12, 1998, I stayed the preliminary injunction until March 31, 1998, in order to determine an appropriate bond pursuant to Fed.R.Civ.P. 65(c) and for further briefing of the constitutional question. Defendants ask for a ruling that the FTDA is unconstitutional as applied to these facts, a holding that would vitiate the preliminary injunction issued on February 5, 1998. In the event of a contrary finding, the defendants have moved to (1) set an appropriate bond, (2) stay the injunction pending appeal, and, (3) specify the scope of the injunction [docket entry # 65]. Plaintiffs subsequently

moved to enforce the Preliminary Injunction [docket entry # 96].

I now decide each issue in succession.

## I. CONSTITUTIONALITY OF THE FTDA

This case raises the question of whether applying dilution protection under the FTDA for a product's trade dress configuration as against a competitor's similar product violates the "limited Times" provision of the Constitution's Patent Clause. U.S. Const. art. I, § 8, cl. 8. Defendants claim that the FTDA, applied to the facts at bar, unconstitutionally extends patent-like protection for an unlimited time to the physical design of a product.

Prior to the passage of the Federal Trademark Dilution Act, trademarks were protected under section 43(a) of the Lanham Act from infringement only. 15 U.S.C. § 1125(a). Infringement suits focused on the acts of competitors fraudulently diverting sales by "passing off" one competitor's goods as those of another, thereby confusing the public as to the source of the product. The threshold question for a non-registered mark, such as the faucet at issue, was whether it was "distinctive." A mark would be considered distinctive when it represented a feature by which consumers "identify and distinguish a product from others," 15 U.S.C. § 1052.

Congress' authorization to protect trademarks derives from the Commerce Clause of the Constitution, U.S. Const. art I, § 8, cl. 3, a clause which has been broadly interpreted for nearly sixty years.[1]

As noted in my February 5, 1998, Order, trademark protection was eventually extended to cover not only words or symbols identifying products but also the packaging and even features of the product itself. This concept became known as trade dress, "the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer." *Chrysler Corp. v. Silva*, 118 F.3d 56, 58 (1st Cir.1997) (quoting *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 999 (2d Cir. 1997)) (providing trademark protection to the design of the Dodge Viper).

What the original Lanham Act did not cover, but various state laws did, were the actions of non-competitors appropriating a famous mark.[2] Such actions would not deceive or confuse customers purchasing the goods designated by famous marks since, typically, different products were involved. Nevertheless, states recognized the need to prevent marks from being "diluted," disassociated from the product in connection with which it had been used.

In 1996, Congress passed the FTDA which amended the Lanham Act to offer federal dilution protection to the owners of famous marks.[3] Section 43(c) permits the owner of a "famous" mark to obtain injunctive relief against uses of its mark which either tarnish or blur its distinctiveness. Consistent with most state dilution laws, 15 U.S.C. § 1127 does not require a showing of a likelihood of confusion, mistake or "deception." Nor does it matter if the products at issue belong to a non-competitor. Congress defined dilution such that it may now be found regardless of the "presence or absence of . . . competition between the owner of the famous mark and other parties." 15 U.S.C. § 1127.

Defendants argue that the application of the FTDA to this case extends the Lanham Act far beyond its original boundaries and treads on the Constitution's Patent Clause. The FTDA as applied in this case would provide (1) protection for a product design,

---

1. As evidence of the scope of Congress' Commerce Clause power, *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) is the first time since the New Deal era that the Court had invalidated Congressional legislation on Commerce Clause grounds.

2. *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1076 (5th Cir.1997), *reh'g en banc denied,* (1997) (noting that "a federal cause of

action for trademark dilution was apparently not available until the Lanham Act was amended to include one in 1996." *See* 15 U.S.C. § 1125(c), added by Pub.L. No. 104-98, § 3(a) (1996)).

3. The Dilution Act is set forth in a new Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and in a new definitional section of Section 45 of the Lanham Act, 15 U.S.C. § 1127.

(2) against similar products, (3) under a dilution theory, that does not require proof of consumer confusion, and, (4) for an unlimited period of time. Defendants contend that the result is a direct violation of the "limited Times" provision of the Patent Clause.

Lund and Kroin reply that the extension of federal protection to trade dress dilution is appropriate. Prior to the passage of the FTDA, the case law made no distinctions between trademarks and trade dress; trade dress, interpreted to cover product configurations, is to be accorded the same protection as trademarks. The trademark case law, to the extent that it dealt with the Patent Clause implications, entirely supports their position. The case law interpreting Congress' Commerce Clause powers is also extremely broad; no case has ever challenged Congress' right to regulate intellectual property in interstate commerce. Finally, plaintiffs argue that trademarks and patents are conceptually distinct, that they stem from different sources, and that they protect different interests. The boundaries between patent and trademark protection, they suggest, are policed by the concept of functionality; functional designs are subject to patent protection; non-functional designs are protectable under trademark law.

This already difficult inquiry is complicated by the fact that it has been raised in a preliminary injunction setting on a truncated record.

I find that defendants cannot show a likelihood of success on the merits of their constitutional challenge. The stay of the injunction issued on February 12, 1998, is hereby lifted.

### A. *The Preliminary Injunction Standard*

The question before me arises in the context of a challenge to the preliminary injunction which I issued on February 5, 1998. I subsequently stayed the injunction to give the parties an opportunity to brief these important constitutional issues, and to present evidence on other issues, notably the amount of bond to be posted in the event the

stay is lifted. Defendants now move to vacate that preliminary Order, or, if I conclude that the defendants cannot show a likelihood of success on the merits of their constitutional claims, to continue the stay of the Order based on their claimed irreparable harm.

■ As I noted in my Orders of February 5, 1998, and February 26, 1998, the issuance of a preliminary injunction and a stay thereof are both governed by the four-part standard announced in *TEC Eng'g Corp. v. Budget Molders Supply,* Inc., 82 F.3d 542 (1st Cir. 1996). In intellectual property cases, the most significant factor in determining whether a preliminary injunction is issued is whether the moving party has demonstrated a likelihood of success on the merits. *Memorandum and Order* of February 5, 1998, at 9.

■ At a minimum, defendants must therefore prevail upon this Court that their constitutional challenge shows a likelihood of success on the merits in order to disrupt the preliminary injunction that I found was needed to protect the plaintiffs' product from dilution. Given the novelty of the defendants' claim, that is a tall order.

### B. *Defendants' Challenge*

Defendants challenge the interpretation of the FTDA that would extend dilution protection to the product designs of competitors, as well as the constitutionality of that conclusion. With respect to the first issue, statutory construction, I find my February 5, 1998, Order dispositive. By its express terms, the FTDA applies to plaintiffs' claim for protection of the VOLA faucet from their competitors' dilution.

With respect to the latter, defendants maintain that by granting relief to the owner of a famous mark against another product design *"regardless of the presence or absence of ... competition,"*[4] the FTDA effectively gives those "shapes" perpetual protection in violation of the Patent Clause. In the realm of product configurations, according to the defendants, the only interpretation of the FTDA that would avoid a collision with the

---

4. *See* 15 U.S.C. § 1127 (emphasis supplied).

Patent Clause is one that requires a finding of consumer confusion.

Defendants Kohler and Robern point specifically to a trilogy of cases which invalidated state regulations that were found to be inconsistent with the federal patent regime. *See Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Bonito Boats Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). Although these cases turn on federal preemption principles, defendants claim they illustrate a more general issue: They show the point at which laws that protect product designs *per se* and thus, that require no showing of consumer confusion, run afoul of the Patent Clause of the Constitution.

In *Bonito Boats,* for example, the Supreme Court invalidated a Florida statute that prohibited the use of a direct molding process to duplicate a certain fiberglass hull. The statute, the Court held, effectively engrafted patent protection on to an otherwise unpatented product; competitors could not copy it without violating Florida law.

Patents, the Court noted, protect innovative products for a limited time; when the patent expires others should be encouraged to copy it.[5] Knowledge that is already available to the public—anticipated by prior art, or obvious, 35 U.S.C.A. §§ 102(a) and (b)—could not be made the subject of a state monopoly.[6]

■ States may not interfere with the balance that Congress has struck in the patent regime. States are not, however, foreclosed from regulation. They may regulate trade secrets, a form of information that is not in the public domain. They may also regulate unfair competition, "businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods," *Sears, Roebuck, & Co. v. Stiffel Co.,* 376 U.S. at 232, 84 S.Ct. 784.

Trade dress protection, the Court suggested, raised more complicated issues; it potentially involved the subject of design patents. *Bonito Boats,* 489 U.S. at 152, 109 S.Ct. 971. However, even here, states may regulate, so long as "such designs are used in order to prevent consumer confusion as to source." *Id.* at 154, 109 S.Ct. 971.

In *Escada Ag & Co. v. The Limited, Inc.,* 810 F.Supp. 571 (S.D.N.Y.1993), the Court applied the same analysis to a state dilution law. There, the Court invalidated a New York dilution law invoked by plaintiff Escada to protect the design of Escada fragrance bottles from copying by a competitor selling similar products. Where the state statute did not involve unfair competition and where source confusion was irrelevant, the Court held that it went beyond the limited sphere permitted by *Bonito Boats:* "When the subject matter is potentially patentable, the state interest in protecting the manufacturer from dilution must yield to the national interest in uniform patent law," *Escada,* 810 F.Supp. at 574.

The cases that extend trademark protection to product configurations, defendants maintain, even those decided since the passage of the FTDA, *see, e.g., Chrysler,* 118 F.3d 56, are not inconsistent with their position. With one exception, *Sunbeam Prods. Inc. v. West Bend Co.,* 1996 WL 511639, 39 U.S.P.Q.2d 1545 (S.D.Miss.1996), *aff'd,* 123 F.3d 246 (5th Cir.1997), such cases are infringement actions which required that the plaintiff prove consumer confusion. Federal unfair competition/trademark infringement laws, like state trademark infringement cases, under *Bonito Boats,* do not implicate patent law principles. Dilution claims—against defendants who are direct competitors selling similar products—do. To be sure, *Sunbeam* addressed both trade dress

---

5. The Court noted that patents "embod[y] a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a competitive economy." *Id.* at 141, 109 S.Ct. 971.

6. "The novelty and nonobviousness requirements of patentability embody a congressional understanding, implicit in the Patent Clause itself, that free exploitation of ideas will be the rule, to which the protection of a federal patent is the exception." *Id.* at 151, 109 S.Ct. 971.

infringement and dilution claims, but it failed to analyze the constitutional question raised here to any substantial degree.

Defendants argue that if the only constitutional interpretation of the FTDA is one requiring consumer confusion, plaintiffs' claim fails, since I found there was no confusion as to the products at issue.

### C. *Plaintiffs' Response*

Federal anti-dilution protection, plaintiffs reply, is entirely consistent with Congress' Commerce Clause authorization. The pre-emption cases cited by defendants are irrelevant; those cases simply distinguish between an area in which federal regulation occupies the field, patent law, and those areas appropriate for state regulation. They do not address the question raised here, namely, how federal regulation is to reconcile Commerce Clause power and Patent Clause limitations.

Courts have extended to trade dress the very same protection as trademarks, notwithstanding the constraints of the Patent Clause. Congress understood this when it enacted the FTDA creating a federal cause of action for dilution of trademarks. The FTDA, plaintiffs maintain, was fully consistent with the Commerce Clause. The Patent Clause is not implicated; trademarks and patents fundamentally protect different interests.

 First, plaintiffs trace the breadth of the concept of "trade dress." They note that since the inception of the Lanham Act, both courts and Congress have extended the concept of a trademark from an identifying symbol or logo, to trade dress, to trade dress identified through a product's configuration. In *Kohler Co. v. Moen Inc.*, 12 F.3d

632, 643 (7th Cir.1993), for example, the Court held that the term "trademark" covers a product's design configuration without affronting the Patent Clause. Indeed, even color can, under certain circumstances, form part of a distinctive trademark, as the Court held in *Qualitex Company v. Jacobson Products Company, Inc.*, 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). The Court's rationale was broadly stated: "Since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive." *Qualitex*, 514 U.S. at 162, 115 S.Ct. 1300.[7]

At the same time, the Court held that trade dress was entitled to as much protection as traditional, two-dimensional trademarks. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). *Two Pesos* also found that a plaintiff's trade dress is protectable where it is either "inherently distinctive" or has acquired secondary meaning, i.e. distinctiveness in the minds of the relevant public.[8] *Two Pesos*, 505 U.S. at 773, 112 S.Ct. 2753. Since then, most courts, including the First Circuit, *see Chrysler*, 118 F.3d at 58, have followed suit, eschewing any distinctions between trademarks and trade dress.

Although these were infringement cases decided before the FTDA, plaintiffs contend that their rationale extends to dilution claims under the new statute. Plainly, courts understood the extent to which the trade dress protections in general, even in an infringement action, could implicate patent law principles. In *Kohler v. Moen*, for example, the Seventh Circuit held that Moen's "Legend" faucet and handle design could be registered as trademarks. The Court noted that:

---

**7.** The concept of trademarks has been held to be broad enough to cover pink insulation, *In re Owens–Corning Fiberglas Corporation*, 774 F.2d 1116 (Fed.Cir.1985), and the shape of a muscle car, *Chrysler Corporation v. Silva*, 118 F.3d 56 (1st Cir.1997).

**8.** "The inherent distinctiveness analysis is prospective, even speculative. It is a predictive inquiry. In contrast, the secondary meaning inquiry focuses on evidence of actual consumer association. Another difference is that, in tem-

poral terms, because inherent distinctiveness can be presumed immediately upon use, it affords instant protection. Secondary meaning takes time to develop. Even if it is inferred circumstantially, proof of secondary meaning must await the development of the evidence from which it can be inferred, and thus, protection is not available upon first use." Graeme B. Dinwoodie, *Reconceptualizing the Inherent Distinctiveness of Product Design Trade Dress*, 75 N.C. L.Rev. 471, 487 (1997).

Kohler's contention that even a remote potential for conflict between trademark law and design patent law requires the reversal of this circuit's settled precedent and rejection of the uniform holdings of every court to consider the issue, ignores the Supreme Court's observation in *Two Pesos* that sensitive application of the principles governing trademark recognition can avert the threat of a perpetual trademark 'monopoly.' *Kohler*, 12 F.3d at 642.

Plaintiffs further contend that the preemption cases cited by defendants are not inconsistent with broad federal protection for trade dress. They were Supremacy clause cases, simply marking the boundaries between federal regulation and state laws. The Court's observation that states may not abridge patent-like protection is different than the claim that it is unconstitutional for the federal government to do so. They do not hold that the Patent Clause trumps all product regulation, only that it is for the federal government, not the states, to determine changes in the patent regime, *Bonito Boats* 489 U.S. at 168, 109 S.Ct. 971, a prophesy fulfilled with the passage of the FTDA.

■ Moreover, as a duly authorized statute, the FTDA is presumptively valid: "[A] fundamental rule of statutory construction requires that statutes are to be construed, if possible, in harmony with the Constitution and other applicable statutes." *Kohler*, 12 F.3d at 642. *See also, NLRB v. Catholic Bishop,* 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Nothing in the language of the statute, the legislative history, or the case law adequately rebuts that presumption, particularly in a preliminary injunction setting.

Congress plainly intended to enact dilution protection to the full extent authorized by the Commerce Clause. The House Subcommittee on Courts and Intellectual Property concluded that the patchwork system of state dilution laws was inadequate to protect

marks in the global market place and that the FTDA would "recognize the substantial investment the owner has made in the mark and commercial value and aura of the mark itself ..."[9] This conclusion is found in the language of the FTDA through the grant of protection to any "word, name, symbol, or device, or any combination thereof ...," 15 U.S.C. § 1127, as against competitors and non-competitors alike.[10]

Plaintiffs also posit that Congress' authority under the Commerce Clause is not limited by the Patent Clause since the FTDA and the patent laws affect different national interests. As the *Kohler* majority observed, "courts have consistently held that a product's different qualities can be protected simultaneously, or successively, by more than one of the statutory means for protection of intellectual property," *Kohler*, 12 F.3d at 638.

> Patent law uses property rights to stimulate private investment in new, useful and nonobvious technological information. Trademark law encourages businesses to invest in symbolic information about their goods and services by prohibiting competitors from using the same symbols on their own wares.

Paul Goldstein, *Copyright, Patent, Trademark and Related State Doctrines* 1 (3rd ed.1992).

While both regimes are designed to attract private investment to the individuals and firms that are able to appropriate to themselves the value of the goods they produce, the specific rights to exclude others from producing similar products stem from different authorities.

Trademark law derives from the common law need to protect businesses and consumers from the ills associated with fraud and unfair competition. The federal trademark scheme functions to facilitate and enhance consumer decisions and to create incentives for firms to produce distinguishable goods.

---

9. H.R.Rep. 104–374 (1995), 104th Congr., 1st Sess. 4 (Nov. 30, 1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1030.

10. Although the House Report accompanying the Act is filled with examples of verbal dilution by tarnishment or blurring, as between products of

non-competitors, e.g. KODAK pianos, BUICK aspirin, and DUPONT shoes, the Commerce Clause, plaintiffs argue, permits its extension to the products of competitors. *See* H.R.Rep. No. 104–374, at 3 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1030,

Those incentives are created by Congress under its Commerce ·Clause authority. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 99, 39 S.Ct. 48, 63 L.Ed. 141 (1918).

By contrast, patent law affords limited but powerful protection to inventors for a specified class of inventions. The Patent Clause of the U.S. Constitution gives Congress the power "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings ·and discoveries." U.S. Const. art. I, § 8, cl. 8. The monopoly for a limited duration that characterizes the patent system reflects a balancing between the need to reward invention and the avoidance of practices which stifle competition.

■ The doctrine of functionality defines the difference between the two bodies of law. The doctrine prohibits the use of a product's feature as a trademark if it will put a competitor at a significant disadvantage because the feature is "essential to the use or purpose of the article" or "affects [its] cost or quality." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S., 844, 850, n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Thus, while functionality would prevent "the first company to make an airplane [from using] the characteristic shape of an airplane as its trademark," *W.T. Rogers Co:, Inc. v. Keene*, 778 F.2d 334, 339 (7th Cir.1985), it would not prevent plaintiffs from seeking configuration protection for the famously sleek spout of their faucet.

Courts can plainly distinguish non-functional ornamental designs from functional designs that are properly patented. The Court in *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir.1998), for example, held that a product's configuration that is disclosed in an expired utility patent can be protected as trade dress under the Lanham Act. Although the case did not arise under the FTDA, the importance of the *Thomas & Betts* holding is that only the functional aspects of a product must be protected by a patent. To the extent that the configuration of the head of the two-piece cable tie that Thomas & Betts sought to protect as trade

dress was non-functional, it does not conflict with patent law.

Finally, the only case to address the scope of_ trade dress protection under the FTDA holds that it applies to a product's "total image." *Sunbeam Prods., Inc. v. West Bend Co.*, *supra*, involved the trade dress of a stand mixer in .which the Court issued a preliminary injunction restraining the marketing of a competing product on both infringement and dilution grounds.

### D. *Conclusions*

While defendants raise important issues, I cannot say that they have succeeded in meeting the very high preliminary injunction standard on their claim that the application of the FTDA to the VOLA faucet is unconstitutional. The statute is presumptively constitutional. Not one case construing trade dress protection has found otherwise. As the *Kohler v. Moen* Court held on similar facts, trademark and patent protection may exist side-by-side because they serve different purposes. The functionality test, though vague, at least polices the boundaries between trademark and patent law. Finally, courts have countenanced an expansive interpretation of the Commerce Clause that could plainly cover the FTDA.

### II. *STAYING THE PRELIMINARY INJUNCTION*

Having found that Kohler and Robern's constitutional challenge is inadequate to vacate the preliminary injunction, defendants seek a continuance of the February 12, 1998, stay pending appeal.

■ As noted in my *Order With Respect to Discovery*, February 26, 1998, at 2 (97–10427–NG), the same four considerations dictate when a preliminary injunction issues as when a stay is granted: whether the stay applicant has made a strong showing that it is likely to succeed on the merits, whether the stay applicant will be irreparably harmed absent a stay, whether issuance of a stay will substantially injure other interested parties and whether the stay is in the public interest. *See Morgan v. Kerrigan*, 509 F.2d 618, 619 (1st Cir.1975). Those factors are considered

in the context of the existing preliminary injunction, a state that creates a presumption in favor of the non-moving party.[11]

■ Under this standard, defendants are not entitled to the benefit of a stay. Section I of this opinion decides the likelihood of success question against the defendants. And while this is an admittedly thorny legal question, the public interest and irreparable harm prongs also favor the plaintiffs. As relatively small companies that derive much or all of their business from sales of the VOLA, plaintiffs suffer real, if not easily measured, harm by the dilution of their product. Indeed, much of the case law on preliminary injunction standards has been developed in intellectual property cases, exalting the likelihood of success over all, because without relief, such firms "may well cease to exist." *Standard Havens Prods. Inc. v. Gencor Industries, Inc.*, 897 F.2d 511, 516 (Fed. Cir.1990).

No doubt, defendants will suffer substantial monetary losses owing to the removal of the Falling Water product from the market. But as the Fourth Circuit has noted, in certain circumstances, "[m]ere injuries, however substantial, in terms of money, time and energy expended in the absence of a stay, are not enough," *Long v. Robinson*, 432 F.2d 977, 980 (4th Cir.1970). Unlike the plaintiffs' loss, however, the damage to defendants and their customers who may have to pay a higher price for a non-Falling Water faucet is neither irreparable nor so grave as to affect the public interest. I find that a continued stay will cause at least as substantial a harm, if not a greater one, to the plaintiffs as the lifting of the stay will to defendants. Accordingly, defendants' motion for a stay pending appeal is **DENIED**.

### III. *SECURITY*

■ Absent compelling reasons to the contrary,[12] an appropriate bond must be posted

before the issuance of a preliminary injunction. *Crowley v. Local No. 82*, 679 F.2d 978, 999–1000 (1st Cir.1982), *rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). Fed.R.Civ.P. 65(c) dictates that:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The bond is security against the very real risk that the extraordinary relief plaintiffs have received will wrongfully enjoin defendants' legitimate commercial activities. Ordinarily, the enjoined party provides an accounting of the costs and damages due directly to the injunction.

Here, however, defendants have submitted the highly speculative figure of $4.1 million in losses owing to the injunction. Plaintiffs vigorously oppose defendants' calculations and contend that the correct measure of security is an unknown fraction of defendants' figures and would not include the costs of related products such as sinks and cabinetry. Based on the limited record before me and Fed.R.Civ.P. 65(c)'s stated purpose of reimbursing defendants for *direct* injuries due to the injunction, plaintiffs are **ORDERED** to post security in the amount of $250,000.00.

### IV. *MORE DETAILED PRELIMINARY INJUNCTION*

Defendants have also moved for a more detailed preliminary injunction pursuant to Fed.R.Civ.P. 65(d). I am persuaded, however, that the terms of the injunction are sufficiently clear. The defendants are enjoined

---

11. Defendants cite *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844–45 (D.C.Cir.1977) in support of a different standard. There, the court observed that "tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained." "Even under this standard, defendants cannot receive a continued stay because the sta-

tus quo is untenable. Disrupting the preliminary injunction in this case would act to punish plaintiffs that are entitled to a presumption of harm."

12. Only plaintiffs seeking to vindicate important federal rights are excepted from the bond requirement. Despite plaintiffs protestations to the contrary, no such rights are implicated here.

from selling, advertising or distributing the Falling Water faucet. As previously indicated, the defendants are entitled to copy only functional aspects of the plaintiffs design. Except as indicated below, defendants' motion for a more detailed preliminary injunction is **DENIED.**[13]

**SO ORDERED.**

13. Plaintiffs motion to enforce the preliminary injunction [docket entry # 96] is **MOOTED** by Section IV.