**LUV N' CARE, LTD. and Admar International, Inc., Plaintiffs,**

v.

**REGENT BABY PRODUCTS CORP. d/b/a Baby King, Defendant.**

**No. 10 Civ. 9492 (LLS).**

United States District Court, S.D. New York.

Jan. 11, 2012.

---

Lee A. Goldberg, Morris E. Cohen, Goldberg Cohen, LLP, New York, NY, for Plaintiffs.

James J. Foster, Wolf, Greenfield & Sacks, P.C., Boston, MA, John T. Johnson, Kristen A. McCallion, Fish & Richardson P.C., New York, NY, for Defendant.

## OPINION AND ORDER

LOUIS L. STANTON, District Judge.

Plaintiffs sue defendant for patent infringement under 35 U.S.C. § 271, trademark infringement and unfair competition under 15 U.S.C. § 1125(a), trademark dilution under 15 U.S.C. § 1125(c), trademark dilution under New York General Business Law section 360–*l*, and violations of New York common law.

Defendant moves under Fed.R.Civ.P. 12(b)(6) to dismiss counts III and V of the amended complaint, the federal and state trademark dilution claims.

The federal dilution statute protects "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness" against another's "use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c)(1) (2006) ("TDRA"). Defendant argues that plaintiffs have not pled that their marks are "famous," and thus the marks are not protected under the federal statute.

The New York dilution statute, N.Y. Gen. Bus. Law § 360–*l* (McKinney 2011 Supp.), provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Defendant asserts that because plaintiffs seek patent-like protection under that statute, their claims are preempted by federal patent law. The crux of defendant's argument is that since federal patent law provides the exclusive remedy to an inventor who seeks to prevent others from copying her invention's design, state law cannot serve as an alternative means for inventors to enjoin others from copying their patented or potentially patentable designs.

### Background

The following allegations from the amended complaint are accepted as true, as they must be on this motion to dismiss. *See Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir.2009).

"Plaintiff Luv N' care is one of the leading baby product companies in the world today." Am. Compl. ¶ 18. Its affiliate, plaintiff Admar International, "is the owner of various United States Trademark Applications and Registrations, under which trademarks Luv n' care sells goods throughout the United States under exclusive rights from Admar." *Id.* ¶ 19. Products sold under those trademarks include children's no-spill drinking cups, baby bottles, and pacifiers.

Plaintiffs "have generated hundreds of millions of dollars in revenue from the sale of goods under their trademarks," *id.* ¶ 20,

have "expended significant time, funds and effort in designing and developing esthetically appealing and attractive product designs for Plaintiffs' goods," *id.* ¶ 21, and have "expended significant time, funds and effort in promoting, advertising, marketing and popularizing Plaintiffs' goods," *id.* ¶ 22. "As a result of Plaintiffs' design efforts and promotional, advertising and marketing activities, Plaintiffs' products designs, trademarks and/or trade dress have all become widely known throughout the United States and worldwide, and associated with Plaintiffs." *Id.* ¶ 23. "Plaintiffs' products are among the most popular and well known products in their industry, and their line of products is famous throughout the country and the world." *Id.* ¶ 24.

According to the amended complaint,

25. The appearance of Plaintiffs' original design of their no-spill children's drinking cups, including its "Gripper Cup," "Flip-it," "Hard Spout" and "Grip n' sip" cups (collectively, "No–Spill Cups") are distinctive symbols which serve as trademarks or trade dress of Plaintiffs' products in interstate commerce, both in the United States and worldwide.

26. The design and appearance of Plaintiffs' No–Spill Cups has acquired secondary meaning, and are recognized as identifying Plaintiffs' high-quality products and services.

The amended complaint makes those same allegations that their design and appearance are the trademarks and trade dress of each of plaintiffs' "Gripper–Pal" Bottle, "Brites Pacifier," "Fruit Pacifier," "Sports Pacifier," "Sculptured Pacifier," "Sports Pacifinder," "Pacifinder & Pacifier," "Hard and Soft Teething Keys," and "Food Storage Bowls with Feeding Spoon." *See id.* ¶¶ 28–44.

Defendant is a nationwide distributor of baby products, whose products are sold under other brand names.

Plaintiffs allege that defendant has infringed on their products' trademarks and trade dress by selling "unauthorized knock-offs," *id.* ¶ 102, which look similar to plaintiffs' products, and are thus "deceptive and confusing" to consumers. Defendants allegedly infringed on Admar's trade dress for the following products: the "Gripper Cup," the "Flip-it" cup, the "Hard Spout" cup, the "Grip n' sip" cup, the "Brites Pacifier," the "Sport Pacifier," the "Fruit Pacifier," the "Sculptured Pacifier," the "Sports Pacifinder," the "Pacifinder & Pacifier," the "Gripper–Pal" baby bottle, "Teething Keys," and "Food Storage Bowls with Feeding Spoon."

Plaintiffs further allege that, by selling allegedly infringing products, defendant has diluted plaintiffs' trademarks and trade dress:

103. The trade and consuming public are likely to be misled into believing that the unauthorized knock-offs of Plaintiffs' No–Spill Cups, Gripper–Pal, Pacifiers, Pacifinders, Teething Keys and Food Containers (hereafter, collectively, "The Products") originate with or are otherwise authorized, sponsored and/or licensed by, or associated with the Plaintiffs.

104. Defendant is using The Products' design to trade off of Plaintiffs' reputation and goodwill and to create deception in the marketplace.

105. Defendant is also blurring and tarnishing the distinctive quality of Plaintiffs' famous and extremely strong and distinctive product designs, trade dress and trademarks associated with the products.

106. As shown in the Exhibits, Defendant's products have repeatedly been designed to resemble those of Plaintiffs,

to cause confusion, mistake, and deception in the marketplace.

. . . .

108. Defendant's activities mislead the trade and purchasing public into believing that goods marketed and sold by Defendant originate with or are otherwise authorized by, sponsored by, licensed by, or associated with Plaintiffs.

109. Upon information and belief, Defendant in connection with goods and containers for goods, has used in commerce words, terms, names, symbols or devices, or combinations thereof, false designations of origin, false and misleading descriptions of fact, and false and misleading representations of fact, which: are likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection, and association of Defendant with the Plaintiffs and as to the origin, sponsorship, and approval of Defendant's goods, services and commercial activities.

. . . .

113. Defendant's activities are causing and are likely to cause dilution of Plaintiffs' trade dress and trademarks, including by blurring and by tarnishment.

In addition to their trademark and trade dress claims, plaintiffs allege design patent infringement—for design patents which Luv N' care owns for a drinking cup and a drinking cup top—and New York State common-law claims for unfair competition, tortious interference with prospective business relations, and contributory infringement. Those claims are not in issue in the present application.

### Discussion

"When reviewing a motion to dismiss, a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom,* 562 F.3d at 127 (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), *quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

### Federal Trademark Dilution

#### A.

In their amended complaint, plaintiffs allege, "These marks and trade dress qualify as famous trademarks under the meaning of the Federal Trademark Dilution Act of 1995, Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)." Am. Compl. ¶ 139. However, § 1125(c) was amended in 2006, (the Trademark Dilution Revision Act) which is its current version ("TDRA").

Defendant argues that the claim should be dismissed, since it was brought under the wrong statute. Plaintiffs say that the error was merely clerical, and the court should construe the claim as brought under the TDRA.

Because plaintiffs cite the correct subsection of the statute, i.e., 15 U.S.C. § 1125(c), the mislabeling appears to be merely a typographical error, and the federal dilution claim will be taken as brought under the TDRA.

#### B.

Defendant claims that plaintiffs fail to plead that their trademarks are famous under the TDRA, 15 U.S.C. § 1125(c)(2), which provides:

(A) For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's

owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Courts applying those factors have determined that marks such as NIKE and Mattel's HOT WHEELS are famous under the TDRA. *See Nike, Inc. v. Nikepal Int'l, Inc.,* No. 2:05–CV–1468–GEB–JFM, 2007 WL 2782030, at *5–6 (E.D.Cal. Sept. 18, 2007) (mark famous because Nike "had spent in excess of a billion dollars for promotion of NIKE products in the United States," sales of NIKE products had earned at least $1 billion per year, "recognition of the success of NIKE has been recorded by various publications in surveys and articles," and "the NIKE mark is registered on the PTO's principal register"); *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 635 (9th Cir.2008) ("Here, a reasonable trier of fact could conclude that the HOT WHEELS mark is famous: it has been in use for over thirty-seven years; 350 million dollars have been expended in advertising the mark; three billion HOT WHEELS units have been sold since the inception of the mark; and HOT WHEELS are sold in all fifty states and throughout the world.").

■ In this case, plaintiffs do not plead enough facts to support the assertion that their marks are similarly famous.

They plead no facts regarding their advertising and publicity of the marks of the particular products in suit, nor do they plead that their marks are registered. *See* 15 U.S.C. § 1125(c)(2)(A)(i), (iv).

Plaintiffs' allegation that they "have generated hundreds of millions of dollars in revenue from the sale of goods under their trademarks," Am. Compl. ¶ 20, refers generally to "goods under their trademarks" as a whole, not the "amount, volume, and geographic extent of sales of goods or services offered under the" marks in suit, 15 U.S.C. § 1125(c)(2)(A)(ii), which in this case are "appearance and design" of the cups, pacifiers, teething rings, and food containers which plaintiffs claim defendant has diluted. Thus, that allegation does not support plaintiffs' argument that those marks are famous.

The more general allegations that plaintiffs products' "designs, trademarks and/or trade dress have all become widely known throughout the United States and worldwide, and associated with Plaintiffs," *id.* ¶ 23, and "Plaintiffs' products are among the most popular and well known products in their industry, and their line of products is famous throughout the country and world," *id.* ¶ 24, are conclusions, lacking factual references to the trademarks and trade dress in suit, and therefore do not support the allegation that the marks in suit are famous. *See Iqbal,* 129 S.Ct. at 1949, *quoting Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 ("A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' ").

At best, plaintiffs plead fame among baby product consumers. However, as courts have noted, the inclusion in the TDRA of the phrase "widely recognized by

the general consuming public of the United States" "was intended to reject dilution claims based on niche fame, *i.e.* fame limited to a particular channel of trade, segment of industry or service, or geographic region." *Dan–Foam A/S v. Brand Named Beds, LLC,* 500 F.Supp.2d 296, 307 n. 90 (S.D.N.Y.2007) (internal quotation marks omitted). "One of the major purposes of the TDRA was to restrict dilution causes of action to those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls, and the like." *Bd. of Regents, Univ. of Tex. Sys. v. KST Elec., Ltd.,* 550 F.Supp.2d 657, 679 (W.D.Tex. 2008) (citations omitted).

Even under the TDRA's predecessor, the Federal Trademark Dilution Act of 1995 ("FTDA"), which did not include the requirement that the mark be widely recognized by the general consuming public, the Court of Appeals recognized that niche fame would not suffice:

It seems most unlikely that Congress intended to confer on marks that have enjoyed only brief fame in a small part of the country or among a small segment of the population, the power to enjoin all other users throughout the nation in all realms of commerce. The examples of eligible "famous marks" given in the House Report—Dupont, Buick, and Kodak—are marks that for the major part of the century have been household words throughout the United States. They are representative of the best known marks in commerce.

*TCPIP Holding Co. v. Haar Commc'ns, Inc.,* 244 F.3d 88, 99 (2d Cir.2001).

In *Board of Regents,* the University of Texas ("UT") sued KST Electronics for diluting its longhorn silhouette logo ("LSL"). The court granted summary judgment[1] in favor of KST on the UT's dilution claim, finding that the LSL was famous only within the niche market of college sports fans. The court held that despite evidence that the LSL was prominently displayed during nationally televised sporting events and in nationally circulated sports magazines, the mark was not famous under the TDRA:

Reading through the evidence, it is not at all clear that if one is not a college football fan (or, to a much lesser extent, college baseball or basketball fan) would [sic] recognize the LSL as being associated with UT, as all of the evidence relates to the use of the logo in sporting events. The Court is well aware that NCAA college football is a popular sport—the Court counts itself as a more than casual fan of Saturday afternoon football in the Fall—but this hardly equals a presence with the general consuming public (nearly the entire population of the United States). Simply because UT athletics have achieved a level of national prominence does not necessarily mean that the longhorn logo is so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK.

550 F.Supp.2d at 678.

In *Heller Inc. v. Design Within Reach, Inc.,* No. 09 Civ.1909(JGK), 2009 WL 2486054, at *4 (S.D.N.Y. Aug. 14, 2009), the Court dismissed the plaintiff's claim under the TDRA that its trademark for a "Bellini Chair" had been diluted, because the allegation that the "trademark is well known to the 'relevant public interested in contemporary furniture'" pled only niche fame.

Like the plaintiffs in *Board of Regents* and *Heller,* plaintiffs in this case have not

---

**1.** The reasoning behind the grant of summary judgment is contained in Magistrate Judge Austin's report and recommendation, 550 F.Supp.2d at 662–80, which was approved and accepted in full by the district court, 550 F.Supp.2d at 662.

alleged facts indicating that the cups', bottles', pacifiers', teething keys', and food containers' trademarks are recognized beyond a niche market, i.e., the baby product market.

■ Plaintiffs attempt to distinguish the trademark in *Heller*, which "was well known only in the contemporary furniture niche of the population," Pls.' Mem. Opp. 11, from the marks in this case, "which have acquired nationwide and international recognition by baby product consumers, a large segment of the population," *id.* Even so, the standard for fame under the TDRA is whether a mark is recognized not merely by "a large segment of the population," but by the "general consuming public of the United States."

Plaintiffs have not sufficiently pled that the particular trademarks and trade dress involved in this suit are famous, and therefore their amended complaint does not state a claim for dilution under the TDRA. They may replead their federal dilution claim by filing a second amended complaint within 30 days from this opinion and order.

### New York General Business Law

■ Plaintiffs allege that, by copying plaintiffs' products, defendant violates New York's dilution statute, N.Y. Gen. Bus. Law § 360–*l*.

Defendant argues that plaintiffs' section 360–*l* claim is preempted by federal patent law, since plaintiffs invoke the statute to gain patent-like protection (prohibition against making, using, or selling) for their designs. Indeed, two of plaintiffs' designs now benefit from federal patent protections, and in other counts of their amended complaint plaintiffs seek to enforce rights under their patents in this suit.

In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), the Supreme Court held that "state regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws." That holding was based on the principle that

> The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years. "[The inventor] may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and consequent benefit to the community, the patent is granted. An exclusive enjoyment is guaranteed him for seventeen years, but upon expiration of that period, the knowledge of the invention inures to the people, who are thus enabled without restriction to practice it and profit by its use." *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 186–187, 53 S.Ct. 554, 77 L.Ed. 1114 (1933).

> The attractiveness of such a bargain, and its effectiveness in inducing creative effort and disclosure of the results of that effort, depend almost entirely on the backdrop of free competition in the exploitation of unpatented designs and innovations. The novelty and nonobviousness requirements of patentability embody a congressional understanding, implicit in the Patent Clause itself, that free exploitation of ideas will be the rule, to which the protection of a federal patent is the exception. Moreover, the ultimate goal of the patent system is to bring new designs and technologies into the public domain through disclosure. State law protection for techniques and designs whose disclosure has already been induced by market rewards may conflict with the very purpose of the patent laws by decreasing the range of

ideas available as the building blocks of further innovation. The offer of federal protection from competitive exploitation of intellectual property would be rendered meaningless in a world where substantially similar state law protections were readily available. To a limited extent, the federal patent laws must determine not only what is protected, but also what is free for all to use.

*Id.* at 150–51, 109 S.Ct. 971 (brackets in *Bonito Boats*).

The Court noted that not all state regulation of potentially patentable designs is prohibited: "... States may place limited regulations on the circumstances in which such designs are used in order to prevent consumer confusion as to source." *Id.* at 154, 109 S.Ct. 971.

However, as this Court stated in *Escada AG v. Limited, Inc.,* 810 F.Supp. 571, 574 (S.D.N.Y.1993), "one cannot argue that the New York dilution statute serves that purpose in this case, for the statute does not require any showing of consumer confusion as to the source of goods or services," and held that the "New York dilution statute as applied to potentially patentable designs goes beyond the limited regulation permitted by *Bonito Boats,*" reasoning that if the statute could be applied to enjoin a defendant from "making, using or selling" a design mimicking a plaintiff's, then "a would-be inventor in New York would not have to meet the rigorous standards for obtaining a patent and his right to exclude copiers would not be confined to a design patent's 14 year limit." [2] *Id.*

Plaintiffs argue that *Bonito Boats* should not apply here, since the design in that case was a boat hull that (although originally potentially patentable, 489 U.S.

at 158 n. *, 109 S.Ct. 971) had become "unpatented and unpatentable," *id.* at 159, 109 S.Ct. 971, by its unrestricted sales on the public market, whereas plaintiffs' designs are either patented or their patentability has not been determined.

Put over-simplistically, the underlying concepts in *Bonito Boats* are that potentially patentable designs must either be protected by federal patents, or open to the public to use, and that the federal patent system is the exclusive source for patent-like protection of patentable designs:

Finally, allowing the States to create patent-like rights in various products in public circulation would lead to administrative problems of no small dimension. The federal patent scheme provides a basis for the public to ascertain the status of the intellectual property embodied in any article in general circulation. Through the application process, detailed information concerning the claims of the patent holder is compiled in a central location. See 35 U.S.C. §§ 111–114. The availability of damages in an infringement action is made contingent upon affixing a notice of patent to the protected article. 35 U.S.C. § 287. The notice requirement is designed "for the information of the public," *Wine Railway Appliance Co. v. Enterprise Railway Equipment Co.,* 297 U.S. 387, 397, 56 S.Ct. 528, 80 L.Ed. 736 (1936), and provides a ready means of discerning the status of intellectual property embodied in an article of manufacture or design. The public may rely upon the lack of notice in exploiting shapes and designs accessible to all ....

The Florida scheme blurs this clear federal demarcation between public and

---

**2.** At the time *Escada* was decided, New York's anti-dilution statute was codified at section 368–d of the General Business Law. It has since been recodified, without change, at section 360–*l.*

private property. One of the fundamental purposes behind the Patent and Copyright Clauses of the Constitution was to promote national uniformity in the realm of intellectual property. See The Federalist No. 43, p. 309 (B. Wright ed. 1961). Since the Patent Act of 1800, Congress has lodged exclusive jurisdiction of actions "arising under" the patent laws in federal court, thus allowing for the development of a uniform body of law in resolving the constant tension between private right and public access. See 28 U.S.C. § 1338; see also Chisum, The Allocation of Jurisdiction Between State and Federal Courts in Patent Litigation, 46 Wash. L. Rev. 633, 636 (1971). *Id.* at 161–62, 109 S.Ct. 971.

Affording potentially patentable designs patent-like protection under state laws would impair the uniformity and exclusivity of federal patent laws. Thus, plaintiffs cannot invoke section 360–*l* to enjoin defendant from making, using, or selling products that dilute plaintiffs' potentially patentable designs, whether actually patented or not.

That does not mean that the New York statute serves no purpose. It can be used to enjoin the manufacture, sale, or use of products that dilute a trade name, trademark, or trade dress that is not potentially patentable. *See, e.g., Merriam–Webster, Inc. v. Random House, Inc.,* 35 F.3d 65, 73 (2d Cir.1994) (suit under New York dilution statute to enjoin manufacture, sale, and distribution of dictionaries with similar book jackets).

Even potentially patentable designs and can be protected in other ways. As stated in *Escada,* 810 F.Supp. at 574, in *Bonito Boats*

The Court, however, did not prohibit all regulation of potentially patentable designs: it is permissible for states to require that goods be labeled, or that other precautionary steps, not directed to the copying or reproduction itself, be taken to prevent consumers from being misled as to the source of a product. *Id.* at 154, 109 S.Ct. at 979. *See also, Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 232, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 238, 84 S.Ct. 779, 782, 11 L.Ed.2d 669 (1964). Thus, a state may, without conflicting with patent law, protect trade secrets, *Bonito Boats,* 489 U.S. at 165–66, 109 S.Ct. at 985, and forbid industrial espionage. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 487, 94 S.Ct. 1879, 1889, 40 L.Ed.2d 315 (1974). Such valid state unfair competition and trade secret law "was not aimed exclusively at the promotion of invention itself, and the state restrictions on the use of unpatented ideas were limited to those necessary to promote goals outside the contemplation of the federal patent scheme." *Bonito Boats,* 489 U.S. at 166, 109 S.Ct. at 985.

In passing the FTDA, and later the TDRA, Congress sought to provide a federal remedy for trademark dilution, without preempting state dilution statutes. *See* H.R.Rep. No. 104–374, at 4 (1995) ("It is important that H.R. 1295 would not preempt existing state dilution statutes."); H.R.Rep. No. 109–23, at 8 (2005), 2006 U.S.C.C.A.N. 1091, 1097 (section 2 of TDRA "would protect trade dress or product configuration and it would not preempt state remedies for dilution"). But where the application of state dilution law would usurp the function of federal patent law, the state dilution law must give way. *See E. Am. Trio Prods. v. Tang Elec.,* 97 F.Supp.2d 395, 424 n. 199 (S.D.N.Y.2000) ("To the extent that New York's antidilution statute is designed to prevent defendants from making, using, or selling phone designs that allegedly mimic Eastern's de-

sign, it promotes the same goals as the federal patent scheme and must yield to the national interest in uniform patent law."); *adidas–Am., Inc. v. Payless Shoesource, Inc.*, 546 F.Supp.2d 1029, 1066–68 (D.Or.2008) (claims under a statute "substantively identical" to New York's dilution statute are preempted by federal patent law).

Plaintiffs' claim under section 360–*l* is therefore preempted by federal patent law to the extent that plaintiffs invoke the statute to enjoin the manufacture, use, or sale of products diluting plaintiffs' potentially patentable designs.

### Conclusion

Defendant's motion to dismiss (Dkt. No. 16) is granted to the extent that count III of the amended complaint is dismissed with leave to replead, and count V of the amended complaint is dismissed to the extent that it pertains to potentially patentable designs. Plaintiffs may replead count III by filing a second amended complaint within 30 days from this opinion and order.

So ordered.